UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Thomas Carter, Joy Carter, Joy Carter As parent and next friend of Caleb O'Leary, and Thomas Carter and Joy Carter as parents and next friends of Cassidy Carter, Plaintiffs | |
| v. | C.A. NO. 04-13ML |
| Jay Lindgren, in his capacity as Director, State of Rhode Island Department of Children, Youth & Families, State of Rhode Island, and Candace Salvo, Edward O'Donnell, Martha Branstrom Skelding, Cheryl Csisar, And Maureen Eagen, in their capacities as Officers, agents or employees of the State of Rhode Island Department of Children Youth & Families, Defendants | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now come the named defendants in both their official and individual capacities (Except as to Candace Salvo who is limited to her official capacity because she has not been served in her individual capacity) and hereby move for summary judgment in the above-entitled case, pursuant to F.R.CP. 56, on the grounds that there is no triable issue of material fact in this case, and Defendants are entitled to judgment as a matter of law.

The reasons for the Motion are set forth in the attached Memorandum of Law in Support of Defendants' Motion for Summary Judgment.

Defendants Lindgren, State of Rhode Island, Edward O'Donnell, Martha Branstrom Skelding, Cheryl Csisar and Maureen Eagen, In their official and individual capacities and Candace Salvo in her official capacity

By their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

*Richard B. Woolley*

Richard B. Woolley #1452
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2293
Fax: (401) 222-2995

**CERTIFICATION**

I, the undersigned, hereby certify that I mailed a true copy of the within document postage pre-paid, first class mail, on this *21st* day of February, 2006 to those indicated below:

*Carol Collins*

Thomas M. Dickinson
P.O. Box 9184
Providence, RI 02940-9185

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Thomas Carter, Joy Carter, Joy Carter As parent and next friend of Caleb O'Leary, and Thomas Carter and Joy Carter as parents and next friends of Cassidy Carter,<br>Plaintiffs | : | |
| V. | : | C.A. NO. 04-13ML |
| Jay Lindgren, in his capacity as Director, State of Rhode Island Department of Children, Youth & Families, State of Rhode Island, and Candace Salvo, Edward O'Donnell, Martha Branstrom Skelding, Cheryl Csisar, And Maureen Eagen, in their capacities as Officers, agents or employees of the State of Rhode Island Department of Children Youth & Families,<br>Defendants | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now come the named defendants in both their official and individual capacities (Except as to Candace Salvo who is limited to her official capacity because she has not been served in her individual capacity) and hereby move for summary judgment, in that there is no triable issue of material fact in this case and the Defendants are each entitled to judgment as a matter of law. This case arises out of the Department of Children, Youth and Families' court-approved actions to protect two young children in September of 1999 and in January 2001. This case should be dismissed pursuant to applicable law, as more fully set forth herein.

## I. PLEADINGS

Plaintiff's original complaint was filed with this Court on January 15, 2004. By letter dated and hand-delivered May 12, 2004, counsel for Plaintiffs served Defendants in their official capacities only. Counsel for Plaintiffs was emphatic in his assertion that he was bringing this action against the named Defendants in their official capacities only. Thereafter, Counsel for Defendants filed a Motion to Dismiss based upon Will v. Michigan Dept. of State Police, 109 S.Ct. 2304 (1989). Plaintiffs' Counsel's response was to move to amend his complaint to sue the named Defendants in their individual, as well as official capacities to avoid Will v. Michigan. This Court allowed the amendment over the objection of Defendants' Counsel.

This matter is now before this Court on Plaintiffs' Amended Complaint based upon the following vague, conclusory allegations.

3. Plaintiffs bring this action against Lindgren, Salvo, O'Donnell, Skelding, Csisar and Egan in their individual capacities.

5. On or about January 17, 2001, Cassidy C. was born to Thomas and Joy Carter.

6. On various and diverse dates prior to January 23, 2001, agents or employees of the Department of Children Youth & Families, at the direction and instruction of the DCYF defendants and acting under color of state law, without justification, took custody of Caleb O'Leary.

7. On January 23, 2001, agents or employees of the DCYF defendants appeared at the home of Thomas and Joy Carter and entered the home without a warrant in the company of officers of the Charlestown Police Department. Without lawful

authority, but acting under color of state law, the agents removed Cassidy C. from the home and placed her in the custody of the Department of Children Youth and Families.

8. From and after the aforementioned dates, the DCYF defendants deprived the Plaintiffs of their civil rights by intruding in to the privacy of their home, interfering with their familial relationship, interfering with their right to privacy and their right to freedom from unreasonable government intrusion, interfering with the family's right to raise and care for children in the way they best see fit, and causing the Defendants Thomas Carter and Joy O'Leary to be subjected to unreasonable and unfair legal proceedings of a criminal, civil, and administrative nature.

Plaintiffs assert three Counts as follows:

Count I. – 42 U.S.C. § 1983

11. The DCYF defendants, acting under color of law, have deprived the Plaintiffs of their rights, privileges and immunities secured by the Constitution and laws of the United States.

Count II –Rhode Island Constitution

14. The DCYF defendants have deprived the Plaintiffs of their rights, privileges and immunities secured by the Rhode Island Constitution.

Count III – Injunctive Relief

17. Plaintiffs say that the deprivation of rights alleged herein is ongoing and continuous and that the Plaintiffs remain threatened with additional deprivation by the DCYF defendants.

18. Plaintiffs are entitled to injunctive relief restraining the DCYF defendants, in their individual and official capacities, from further depriving the Plaintiffs of rights guaranteed by the United States and Rhode Island Constitutions.

Defendants in their answer denied liability and have asserted the following affirmative defenses:

**FIRST** - Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted. The amended complaint fails to articulate a legally sufficient factual basis for claims under 42 USC 1983 and/or the RI Constitution.

**SECOND** - Defendants have the status of sovereign and all benefits which inure to said status, including the doctrine of sovereign immunity.

**THIRD** - The doctrines of discretionary and judicial immunity bar all claims as against these Defendants.

**FOURTH** - Plaintiffs may not maintain the claims asserted because any challenge conduct by Defendants were justified under the facts and circumstances.

**FIFTH** - If, in fact, any duties were owed to Plaintiff, the Defendants were in the exercise of due care and acted in good faith in fulfilling any such duties.

**SIXTH** - Plaintiffs' claims are bared under the doctrine of prosecutorial immunity.

**SEVENTH** - Plaintiffs may not maintain the claims asserted in the Amended Complaint, in that any parties or non-parties engaging in the challenged conduct enjoyed immunity with respect to that conduct.

**EIGHTH** - Plaintiffs' claims are barred or decreased by comparative and / or contributory negligence.

**NINTH** - Plaintiffs' claims are barred by the Public Duty Doctrine.

**TENTH** - Plaintiffs may not maintain the claims asserted in the Complaint because any injury or damage suffered by the Plaintiffs was proximately caused by the intentional or negligent conduct of a person or persons other than Defendants.

**ELEVENTH** - Defendants were acting within the scope of their respective offices or employment, in an authorized manner, and in their official capacities, and not in their personal / individual capacities.

**TWELFTH** - Defendants at all times acted reasonably and in good faith and did not violate any clearly established constitutional rights of the Plaintiffs. Therefore, said Defendants are entitled to qualified immunity from suit.

**THIRTEENTH** - Plaintiffs claims are barred by the statute of limitations.

**FOURTEENTH** - This court lacks jurisdiction over the subject matter and the parties defendant in this case.

**FIFTEENTH** - This action is barred by Res Judicata and collateral estoppel.

**SIXTEENTH** - Plaintiffs Thomas Carter and Joy Carter lack standing to bring this action on behalf of minor Plaintiffs.

**SEVENTEENTH** - This action is barred by the 11th Amendment to the U.S. Constitution.

**EIGHTEENTH** - Plaintiffs Thomas Carter and Joy Carter assumed the risk of injury by knowingly and willfully engaging in inappropriate conduct.

**NINETEENTH** - Defendants had probable cause.

## II. ARGUMENT

**Standard for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56, the defendant is declaring that the evidence in this case is insufficient to support the Plaintiff's case. Summary judgment should be granted when "there is no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law."

In determining whether or not there is a genuine issue as to any material fact, the Court must examine the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. Wojcik v. Town of North Smithfield, 874 F.Supp. 508, 515 (D.R.I. 1995), citing Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

The mere existence of an alleged factual dispute between the parties will not defeat a properly supported Motion for Summary Judgment. Id. A genuine issue is one that can be resolved only by a finder-of-fact. A material issue of fact "is one that may effect the outcome of the suit under the governing law." At the summary judgment stage, "the Court must decide whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law." Id. A dispute over some facts does not preclude summary judgment if all facts and reasonable inferences drawn from them support judgment for a moving party. National Credit Union Administration Board v. Regine, 795 F. Supp. 59 (D.R.I. 1992). Summary judgment is appropriate when, based upon pleadings, affidavits and depositions, there is no genuine issue as to any material fact, and the moving party is

entitled to judgment as matter of law. Hope Furnace Associates, Inc. v. Federal Deposit Insurance Corporation, 71 F.3d 39 (1st Cir. 1995).

I. Plaintiffs' 42 U.S.C. 1983 Claims Against the State of Rhode Island and its Named Officers and employees, In Their Official Capacities, Must Be Dismissed Pursuant to Will v. Michigan .

Plaintiffs first brought this action against the named defendants, in their official capacity only, pursuant to 42 U.S.C. 1983 and the Rhode Island Constitution. Although Plaintiffs Amended Complaint alleges that they bring this action against Lindgren, Salvo, O'Donnell, Skelding; Csisar and Egan in their individual capacities, the undisputed evidence shows that at all times these named defendants were acting in their official capacities, pursuant to the statutory mandates of R.I.G.L. § 40-11-1, et seq.

On its face, Plaintiffs' complaint fails to establish the jurisdictional predicate for a 42 U.S.C. 1983 action in this Court.

> "As it is well settled "that neither a state agency nor a state **official** acting in his **official capacity** may be sued for damages in a section 1983 action," *Johnson v. Rodriquez*, 943 F.2d 104, 108 (1st Cir. 1991)(citing ***Will v. Michigan*** *Dep't of State Police*, 491 U.S. 58, 71 109 S.Ct. 2304, 2312, 015 L.Ed.2d 45 (1989)), *cert. Denied*, 502 U.S. 1063, 112 S.Ct. 948, 117 L.Ed.2d 117 (1992); *see also Kaimowitz v. Board of Trustees, Univ. of Ill.*, ***701** 951 F.2d 765, 767 (6th Cir. 1991)(finding that, as neither the state nor its "alter ego" (state university) is a "person" for section 1983 purposes, neither is subject to suit under section 1983), ...*Wang v. New Hampshire Bd. Of Registration In Medicine*, 55 F.3d 698, 700, 701 (1st Cir. 1995).

This Court lacks subject matter jurisdiction and the complaint should therefore be dismissed.

II. Plaintiffs Claims Against the State of Rhode Island and Its Named Officers and Employees, in Their Official Capacities Are Barred by Eleventh Amendment Immunity.

The Eleventh Amendment bars suits brought against States in federal court when the State has not waived its sovereign immunity. Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996)); Pennhurst State Sch. & Hosp. V. Halderman, 465 U.S. 89, 98, 106 (1984). The Eleventh Amendment presupposes that each state is a sovereign entity in our federal system and that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. Seminole Tribe of Florida, 517 U.S. 54. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI. This jurisdictional limitation recognizes that the States retain certain attributes, including sovereign immunity, although they are part of the federal structure. E.g., Seminole Tribe, 517 U.S. at 54; Pennhurst, 465 U.S. at 98. In the absence of consent by the State, an action may only be brought against the State if Congress has expressly abrogated the State' sovereign immunity. Pennhurst, 465 U.S. at 100.

Because States are immune from suit under the Eleventh Amendment, suits against State agencies in which a judgment would be satisfied out of public funds are also prohibited. See Quern v. Jordan, 440 U.S. 332, 337 (1979)("[A] suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the

state treasury is barred by the Eleventh Amendment"). The Rhode Island Department of Children, Youth and Families is a state agency for Eleventh Amendment purposes. As DCYF has not consented to suit in this case, Plaintiff's claims are barred unless Congress has expressly abrogated the States' sovereign immunity from suit in the statute under which he sues.

Eleventh Amendment immunity also applies to officials of the State sued in their official capacity, because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985); accord Edelman v. Jordan, 415 U.S. 651, 663. See also Eaglesmith v. Ward, 73 F.3d 857, 859 (9th Cir. 1995) (affirming dismissal of § 1983 claim against California school superintendent on Eleventh Amendment grounds). Because Plaintiff's suit names the State, an agency of the State, namely DCYF and its employees in their official, as well as individual capacities. Plaintiffs' claims are barred by the Eleventh Amendment.

III. Plaintiffs' Claims Against the Defendants In Their Individual and Official Capacities Are Barred By the Statute of Limitations.

None of the Defendants named individually herein had anything to do with the decision to remove or the removal of Cassidy from the home. It is indisputable that the last contact defendants Egan, Csisar, Brandstromskelding, and O'Donnell had with plaintiffs was at the latest December of 2000 and only involved Caleb, not Cassidy.

Plaintiffs' Complaint was not filed until January 15, 2004 and at that time was brought against the defendants in their official capacities only. It wasn't until August 9, 2004 that Plaintiffs sought to amend their complaint to include Defendants in their individual capacities. This Motion to Amend wasn't granted by the Court until October of 2004.

Defendants submit that Plaintiffs' claims arose upon the removal of Caleb from the home in September of 1999 and even if one uses the last date that any individual defendants had involvement with plaintiffs, the three-year statute of limitations would have run out in December of 2003.

Plaintiffs' claims against the named Defendants in both their official and individual capacities are barred by Rhode Island's three-year statute of limitations for torts. Marrapese v. State of Rhode Island, 500 F.Supp. 1207 (D.R.I. 1980).

## IV. The Named Defendants Are Entitled to Absolute Judicial Immunity In This Action.

Decisions regarding the placement and monitoring of abused or neglected children are cloaked with absolute judicial immunity. Martin v. Children's Aid Society, 215 Mich. App. 88, 544 N.W.2d 651 (1996); Babcock v. Tyler, 884 F.2d 497 (9th Cir. 1989); Vosburg v. Dept. of Social Services, 884 F.2d 133 (4th Cir. 1989); Coverdell v. Dept. of Social & Health Services, 834 F.2d 758 (9th Cir. 1987); Meyers v. Conti Costa Co. Dept. of Social Services, 812 F.2d 1154 (9th Cir. 1987); Kursawz v. Mueller, 732 F.2d 1456 (6th Cir. 1984).

All actions taken by the named defendants were subject to the approval of and were in fact approved by the Rhode Island Family Court. The named Defendants and each of them are entitled to absolute judicial immunity.

## V. Defendants Are Entitled to Absolute Prosecutorial Immunity For Actions Taken In This Case.

In Thomason v. SCAN Volunteer Services, Inc., 85 F.3d 1365 (8th Cir. 1996), the Court held that Child Welfare Authorities were absolutely immune from liability in civil rights actions for their initiation of ex parte proceedings in State court that led to award of

temporary protective custody of a child to the State. To the extent Wordlaw and SCAN are sued for initiating the judicial proceedings, Wordlaw's role was functionally comparable to that of a prosecutor. Myers v. Morris, 810 F.2d 1437 (8th Cir.) (Prosecutor is absolutely immune for initiating neglect proceedings in Family Court) (Citing Mazor v. Skelton, 637 F.Supp. 330, 334-335 (N.D. Cal. 1986) (role of social worker in filing proceedings to protect abused minors is functionally comparable to prosecutor's initiation of the judicial process, thus warranting absolute immunity) cert denied 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987).

Although Defendants in this case did not initiate the proceedings, their role is to participate in the Family Court proceedings to implement the case plan and other Family Court orders that flow from the initial proceedings and they should benefit from the same absolute immunity.

VI. This Case should be Dismissed Against the Defendants Pursuant to the Doctrine of Qualified Immunity.

Qualified immunity protects the Defendants, Department of Children, Youth and Families, and the named Defendants individually in the exercise of their discretion "from personal liability for civil damages, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a person would have known." Harlow v. Fitzgerald, 457 U.S. 800 (1982).

In Anderson v. Creighton, 483 U.S. 635; 107 S.Ct. 3034 (1987), the United States Supreme Court defined the scope of qualified immunity as follows:

> "[G]overnment officials performing discretionary functions [have] qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought to be consistent with rights they are alleged to have violated. Somewhat more concretely,

> whether an official protected by qualified immunity may be held to be personally liable for an alleged unlawful action, generally turns on the 'objective reasonableness' of the action assessed in the light of the legal rules that were 'clearly established' at the time it was taken." (citations omitted).

The Court defined "clearly established" by stating that 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right.' Anderson at page 640.

Qualified immunity as a matter of public policy mandates that insubstantial claims against the government and its officials not proceed to trial. Harlow v. Fitzgerald, 457 U.S. 800 (1982) (*citing* Butz v. Economou, 438 U.S. 478 (1978)). The U.S. Supreme Court in Harlow v. Fitzgerald, redefined qualified immunity in such a way as to "permit the resolution of many insubstantial claims on summary judgment" and to avoid "subject[ing] government officials either to the cost of trial or the burdens of broad reaching discovery" in cases wherein the legal norms the officials are alleged to have violated are clearly established at the time. Mitchell v. Forsyth, 472 U.S. 526 (1985) (citations omitted). Entitlement to qualified immunity gives a government official immunity from the process of litigating the case itself rather than merely affording a defense to liability.

The defense of qualified immunity offers sanctuary not only to government officials who act with impeccable propriety, but also to those who err but could not have reasonably understood that their actions infracted a prospective plaintiff's federally assured rights." deQuintero v. Aponte-Rogue, 974 F.2d 226, 228 (1st Cir. 1992) (citations omitted).

The First Circuit has held that analyzing qualified immunity is a two-step process. Buenrostro v. Collazo, 973 F.2d 39, 42 (1st Cir. 1992). "[A] court must ascertain whether the plaintiff has alleged, with the requisite particularity, that a state actor violated some right that emanated from federal law." Id. (*citing* Siegart v. Gilley, 111 S.Ct. 1789, 1793 (1991)). Next, it must "ascertain whether the right at issue was 'clearly established' at the time of the infringement." Id. at 42. (*Citing* Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

In the First Circuit, qualified immunity is alive and well. *See, e.g.,* Vazques Rios v. Hernandez Colon, 819 F.2d 319 (1st Cir. 1987); Nunez v. Izquirdo-Mora, 834 F.2d 19 (1st Cir. 1987); Figueroa-Rodrigues v. Acuino, 863 F.2d 1037 (1st Cir. 1988); Pedro-Cos v. Blais Contreras, 976 F.2d 83 (1st Cir. 1992).

Immunity is to be denied, and a compensatory award will be appropriate, **only if** the official has acted with an impermissible motivation or with such disregard of the person's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith. Wood v. Strickland, 420 U.S. 308 (1975).

Although a government official may have violated a person's constitutional rights, the official retains immunity if he has displayed a state of mind free from malice and has acted with permissible motive. Moreover, the official must act reasonably in light of established law and the circumstances of the case.

As noted, *infra*, this Court and the First Circuit have consistently held that qualified immunity is a complete bar to these types of actions. Watterson v. Page, 987 F.2d 1 (1st Cir. 1993); Frazier v. Bailey, 957 F.2d 920 (1st Cir. 1992); Charron v. Picano,

811 F.Supp. 768 (D.R.I. 1993); DeCosta v. Chabot, No. 94-2131 (1st Cir. 1995), per curiam; and Wojcik v. Town of North Smithfield, No. 95-1594 (1st Cir. 1996).

In each of the above cases, the Courts held that the rights plaintiff alleges herein were violated by this defendant are not clearly established.

In Watterson v. Page, supra, a mother, grandparents, and two minor children brought a §1983 action against psychologists for violation of rights similar to those claimed herein. They alleged that the psychologist was negligent, testified falsely, and withheld evidence. Despite the seriousness of these charges, the Court dismissed the complaint on qualified immunity grounds even though it was not relied on by defendant when opposing plaintiffs' Motion for Summary Judgment. Id. at 7, Fn. 3. The Court held that taking all of plaintiffs' allegations as true, they did not state a constitutional claim under any theory. Id. at 8-9.

The facts in the case of Charron v. Picano, 811 F.Supp. 768 (D.R.I. 1993), are strikingly similar to the case at hand. In that case, a state official authorized removal of a child from a home after the physician reported suspected child abuse in a Physician's Report of Examination. The Court noted that:

> "Under Rhode Island law, a physician treating a child who appears to have been injured by other than accidental means, may cause a child to be kept in a hospital or licensed child care facility for up to 72 hours, with or without parental consent, by completing a section of the report provided for that purpose."

*citing*, R.I. General Laws §40-11-5(a). In that case, the physician did not take physical custody of the child, but left it up to DCYF's discretion.

As a result of the report, DCYF dispatched an investigator to investigate the case. The investigator interviewed the physician, the parents and the children. As a result of

the interviews, the investigator placed the child with relatives. Thereafter, the Plaintiffs filed suit against the Defendants for unlawfully interfering with the family's liberty interests pursuant to 42 U.S.C. §1983.

The Defendants moved for summary judgment with respect to the §1983 claim, and while the objection to the summary judgment was pending, Plaintiffs moved for leave to file an amended complaint adding individually named defendants. The Magistrate Judge recommended denial of the Motion to Amend on the ground that the proposed amendment would require "in effect, that the case 'begin anew' and, therefore, would unfairly prejudice the defendants." The Magistrate Judge found that "the Charrons had no evidence that Fraieli acted individually, rather than in his official capacity. He further found that Fraieli had not been sued personally and would be unfairly prejudiced by now being required to defend himself in that capacity." Id. at Page 770.

The District Court ruled that the Plaintiffs were seeking to avoid summary judgment by moving to amend their complaint. In determining whether or not the Court would allow the Plaintiff to amend the Complaint, the Court found that the proposed amendment should not be allowed because it amounts to nothing "more than an exercise of futility." Id. at Page 772. The Court found that the doctrine of qualified immunity would insulate the DCYF worker for personal liability claims of the Plaintiff. The Court further held that Defendants are entitled to file a Motion for Summary Judgment on qualified immunity grounds and that such is subject to an interlocutory appeal.

The Court concluded that Rhode Island law specifically provides for the temporary removal of a child from the home upon certification by a physician that the child has sustained injuries through other than accidental means. Additionally, the statute

exonerates state officials from liability for acting on such certification. See, Curtis v. State Department for Children and Their Families, 522 A.2d 203 (R.I. 1987). The Court found that the report of the physician and the statements obtained from the children provided ample justification for concern with respect to the child's welfare. Accordingly, based upon the fact that the DCYF worker would be entitled to qualified immunity from the suit that would be filed against him if the amendment were allowed, the Court denied the Motion to Amend the Complaint.

The reasoning set forth in the Charron case is on all fours with the case at hand. In fact, the facts presented in this case are even clearer than those presented in the Charron case. In this case, Dr. Lehrach of Westerly Hospital completed a Physician's Report of Examination and actually took custody of Caleb O'Leary pursuant to R.I. General Laws §40-11-5 and §40-11-6. He then placed custody of the child with the Department of Children, Youth and Families. The DCYF employees, based upon the Physician's Report of Examination, are immune from liability. Curtis, supra. There is absolutely nothing in the record to indicate that Suzanne Dance did anything than what was required of her in her official capacity.

Furthermore, the allegations of Plaintiffs' Amended Complaint fall squarely within the scope of the analysis set forth in Hatch v. Department For Children, Youth & Families, 274 F.3d 12 (1st Cir. 2001) and the named state Defendants have the benefit of qualified immunity in this case, especially since Plaintiffs have failed to conjure up any facts in discovery which would deprive the Defendants of this defense.

Hatch dealt with the temporary removal of a child from the home by a DCYF caseworker. Similar to the case at hand, the child was first placed under a "physicians

hold" pending the institution of proceedings in the Family Court pursuant to R.I. Gen. Laws § 40-11-5(a). The DCYF caseworker immediately took the child into protective custody of DCYF. He conducted an investigation and filed a petition for an ex party order of temporary custody in the Family court which was granted. The child remained in DCYF custody pending further hearings. About a month later the Family Court heard testimony and determined that there was no probable cause to believe that the child had been abused. The Court concluded that returning home would not place the child at risk, rescinded its order granting provisional custody to DCYF and returned the child to the parent.

The Court held, in part, that:

> [14] The appellant's proposed amended complaint focuses on such a temporary custodial interruption: Brown's decision to take John into state custody prior to obtaining a Family Court order. The Court has not had occasion to formulate the contours of the constitutional rule under which a state official lawfully may take temporary custody of a child during an investigation of abuse or neglect, nor has this court dealt definitively with the issue. Other courts have grappled with it, however, and most of them have concluded that a case worker – we use that term generically – may place a child in temporary custody when he has evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse. *See, d.g., Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000); *Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997); *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *Mansano v. S.D. Dep't of Soc. Servs.*, 60 F.3d 505, 511 (8th Cir. 1995). The justification for such a rule is easily grasped: where a state official has a reasonable basis to suspect abuse, "the interest of the child (as shared by the state as parens patriae) in being removed from that home setting to a safe and neutral environment outweighs the parents' private interest in familial integrity as a

> matter of law." *Thomason v. SCAN Volunteer Servs., Inc.*, 86 F.3d 13654, 1373 (8th Cir. 1996).
>
> Hatch at 21.
>
> The Court went on to state:
>
> "... We reject the appellant's view that a case worker, even after he has a reasonable suspicion of child abuse, must conduct a full-blown investigation and elevate that suspicion to the level of probable cause before assuming temporary custody. We hold instead that the Constitution allows a caseworker to take temporary custody of a child, without a hearing, when the caseworker has a reasonable suspicion that child abuse has occurred (or, alternatively, that a threat of abuse is imminent). It follows, therefore, that a parent's right to the care, custody, and control of a minor child is inviolate unless a case worker has such a suspicion."
>
> Hatch at 22.

In the context of the Court's analysis of the taking custody of a child without a hearing, in a footnote at page 21, the Court notes that:

> Once the state takes temporary custody of a child, it must follow procedures adequate to justify that detention. *See Jordan v. Jackson*, 15 F.3d 333, 345-46 (4th Cir. 1994). This process often takes the form – as here – of an ex parte order of temporary custody, followed by a hearing on the merits of the allegations of abuse. *E.g., Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1369-70 (8th Cir. 1996).

That is exactly what happened in the matter now before this Court. Caleb O'Leary was first taken into temporary custody pursuant to a physicians hold; well within the 72 hours provided for by R.I. Gen. Laws § 40-11-5(a) DCYF Caseworker Suzanne Dance filed a petition with the Family Court seeking an ex parte order of temporary custody which was followed by a hearing on the merits of the allegations which were the basis for the temporary custody order. Thereafter, DCYF was awarded temporary

custody and DCYF through Defendants Egan and Csisar began case planning for reunification with the process ordered by and subject to the approval of the Family Court.

Cassidy Carter was first taken into custody pursuant to a 48-hour hold by a DCYF Caseworker in accordance with R.I. Gen. Laws § 40-11-5. Well within the 48 hours, DCYF Social Worker Suzanne Zuffoletti filed a petition seeking an ex parte order of temporary custody which was granted and was followed by a hearing on the merits of the allegations which were the basis for the temporary custody order.

The Family Court retained jurisdiction and control of Cassidy Carter's custody with DCYF throughout the next few months and it was not until some time following Thomas Carter's acquittal of the child molestation charges against him that the Family Court ordered reunification.

In Hatch, the Court concluded that:

> "… The record shows that Brown had a reasonable basis both for suspecting child abuse and for believing John to be in danger (and, therefore, that he acted justifiably in taking the boy into temporary custody). The fact that this suspicion proved, in the long run, to be unfounded does not strip Brown of his entitlement to qualified immunity in regard to a claim for damages. *See Malley*, 475 U.S. at 341, 106 S.Ct. 1092 (emphasizing that the qualified immunity standard protects many mistaken judgments); *Brennan v. Hendrigan*, 888 F.2d 189, 192 (1st cir. 1989) …"
>
> Hatch at 25.

In the case now before the Court, Plaintiffs have sued DCYF employees in their individual capacities who were not even personally or officially involved in the removal of either minor plaintiff and have failed to name the persons who were.

These named individuals clearly had a reasonable basis for all actions they took in relation to the Plaintiffs and all their actions were justified under the circumstances they were presented with.

**Qualified Immunity As to Each Defendant**

**Candace Salvo** – Plaintiffs have never served Candace Salvo and she is not before this Court in her individual capacity. Nonetheless, had she been served, the same qualified immunity arguments made on behalf of the other named defendants would apply to her as well.

**Jay Lindgren** – Although Jay Lindgren is named in his individual as well as his official capacity as Director of the Department of Children, Youth and Families, there is simply no evidence whatsoever that he had any knowledge of, or personal involvement in actions taken by DCYF regarding Plaintiffs. Plaintiffs' action against Lindgren, in his individual capacity, has no factual or legal basis whatsoever.

**Cheryl Csisar** – Cheryl Csisar testified in her deposition that she was assigned the case of Joy O'Leary (Carter) and her son, Caleb O'Leary, by her supervisor, Maureen Egan, on or about September 28, 1999, after Caleb had already been removed from the home. When Cheryl Csisar was first assigned the case, she learned that on September 16, 1999 the DCYF child Abuse and Neglect Hot Line received a call/report from the Charlestown Police stating that there was a concern for the safety of one year old Caleb O'Leary; that on September 17, 1999 DCYF Child Protective Investigator Suzanne Dance was assigned to investigate the report that there had been a serious domestic violence incident at the home of Jay O'Leary. On September 22, 1999 Caleb was examined at Westerly Hospital by Dr. Lehrach, a staff member of that hospital. Dr. Lehrach signed a 72-hour hold

pursuant to R.I.G.L. §§ 40-11-5 and 40-11-6. Thereafter, on September 24, 1999 CPI Suzanne Dance filed an Affidavit In Support of the Order of Detention Ex Parte with the Family Court. On September 24, 1999 the Family Court granted temporary custody of Caleb O'Leary to DCYF and assigned the case for hearing on detention to September 28, 1999. After hearing, the Family Court entered an Order on September 28, 1999 thereby placing Caleb O'Leary under temporary custody of DCYF.

When Social Case Worker Cheryl Csisar was assigned the Joy O'Leary (Carter), Caleb O'Leary case, her job was to work with Joy to develop a case plan to deal with the identified problems which led to removal of Caleb with the goal of reunification of mother and son. She would implement all the services and tasks needed to make a family better.

It was Cheryl's understanding that the basis for the emergency or ex parte petition to remove Caleb from the home was "Domestic Violence; mental health, serious mental health concerns; threats of suicide; violence in the home; substance abuse; there was alcohol involved." There was also concern that Joy wanted to stay with her then Boyfriend Tom Carter.

The Family Court issued a no contact order regarding Tom Carter and Caleb O'Leary. Mr. Carter had a history of violence and had been indicated for sexual molestation against his own son.

It was up to the Family Court when Caleb would be reunited with Joy and whether or not her relation with and subsequent marriage to Tom Carter would impede or prevent reunification.

Between the time Caleb was taken in the fall of 1999 and the time Cheryl Csisar got off the case, there were several reasons why he was away from his mother for so long.

Joy O'Leary Carter had at least two Butler hospitalizations in the time period where Cheryl was assigned to the case. She was doing mental health treatment; she was working on that. She was diagnosed with a psychiatric disability. She had two arrests for domestic violence. She was court-ordered by Judge Rahill to attend domestic violence group at Christ the King Church in Westerly. She and Cheryl Csisar were addressing substance abuse treatment. She was court-ordered to attend treatment, and she went to several different residential treatment programs, which was the court's order; she went to Eastman and there's another one. So they were doing all these things with case planning.

So Cheryl remembered contacting the services, going to the ACI to see Joy and whatnot. She was involved with parenting groups; that was again through the South Shore CAP program. So those were all her issues.

And then also what had happened was DCYF had added to her case plan. Joy Carter had disclosed that she had sexually molested her younger sibling; she disclosed this in a group session while she was at Eastman House, and Eastman House had called Cheryl's supervisor, who alerted her, of course, to say that Joy had made this disclosure. So then DCYF added to her case plan that she needed to address – to participate with the sexual offender evaluation.

Cheryl and her supervisor had asked for a sexual offender eval, so until we see reports we cannot feel certain for a child's safety. That was just one thing that needed to be done. By the time Cheryl got off the case, DCYF wasn't ready to unify Caleb yet. By

the time Cheryl left the case, Joy was still receiving supervised visits that were court-ordered by the court, so the court didn't feel she was ready. DCYF reports to the court, and Cheryl's last time involved, Joy was still addressing her mental health issues, her substance abuse, her domestic violence counseling, mental health treatment, parent-child eval. When Cheryl left the case reunification was not ready, was not going to happen that following week.

Everything Cheryl Csisar did in relation to her attempts to reunify Joy with her son Caleb and to bring Thomas Carter into the reunification process once he and Joy O'Leary were married was done in consultation with DCYF legal counsel, her supervisors and was subject to approval by the Family Court.

Cheryl Csisar's last date of involvement with Joy O'Leary (Carter), Caleb O'Leary and Thomas Carter was December 18, 2000. Ms. Csisar had no involvement with the decision to remove Cassidy from the Carter home.

There is absolutely nothing in the record to indicate that Cheryl Csisar did anything other than what was required of her as the social caseworker assigned this case. She is clearly entitled to qualified immunity.

**Maureen Egan** - Maureen Egan testified at deposition that she was Cheryl Csisar's supervisor and was the casework supervisor for the receiving unit. She testified that Caleb was already in DCYF custody when she opened her file on Joy and Caleb O'Leary on or about September 22, 1999. That was the first date she became involved with the case. Her involvement in the case would have been through Cheryl as her supervisor. The initial ex parte dependency petition was filed by Child Protective Services so she and

Cheryl Csisar were following through with the petition that was already filed. Maureen Egan testified that she was absolutely not involved in a decision or process of making a decision with regard to taking custody of Cassidy Carter. She testified that Caleb O'Leary remained in DCYF custody for such a long period of time.

> "Primarily because of getting mother (Joy) and Tom Carter, at a subsequent date they married, so the two of them, to comply with case plan objectives and tasks. And that's the only reason why youngsters stay in care. If families are progressing and, you know, the child could be safe, we reunify."

While Maureen Egan and Cheryl Csisar were on the case, Thomas G. Carter had been accused and charged with child molestation of his own child and if he were to be found guilty, Caleb O'Leary would not be allowed to return to his mother as long as she remained with Tom.

She testified that Thomas Carter made verbal threats against Cheryl Csisar, would throw her the finger and make very threatening gestures and that they had to get court security involved to ensure her safety.

She testified that removal and reunification of children are subject to approval of the Family Court.

She testified that immediately, within a matter of hours after DCYF would at least decide that the situation warrants a child being taken into essentially protective custody, there is a petition filed with the Family Court to make sure that it is appropriate, that it depends on where the allegations are coming as to the time frames. If you have the hospital involved, it could be 72 hours. Or there's also a provision to have a report done by a physician, which would be 72 hours, but it can be placement outside of a hospital setting. There's also a provision for the police to issue a 48-hour hold, so a decision

would have to be made within that time frame if there's enough to bring the matter before the court. The same with the child protective investigators and the social workers. And throughout this process they seek the advice of agency legal counsel.

Maureen Egan testified that in order for Caleb and Cassidy to be returned back to the custody of Tom and Joy it would require a Family Court order. And the last contact she had with this file or with the matters involving Tom Carter and Joy Carter was December 17th, 2000.

There is no evidence whatsoever that Maureen Egan did anything other than what was required of her as Cheryl Csisar's supervisor. She is clearly entitled to qualified immunity in this action.

**Edward O'Donnell** - Although Edward O'Donnell has no specific recollection of his involvement with the Plaintiffs, the "Observations/Recommendations" Summary of Marta Brandstromskelding dated 11/3/1999 states, in part, that "after one of the DCYF CANTS Supervisors, upon reviewing this completed investigation with Chief CPI O'Donnell, a determination was made to reopen the investigation."

He has testified at deposition that in his experience, in the context of an unfounded investigation, that "upon receipt of additional information a former investigation would have a new look at the entirety."

This is exactly what happened in the Tom Carter investigation. The first CPI investigation was unfounded but that investigation did not have the benefit of disclosures made by the alleged victim to his counselors and therapists. It was a more than reasonable exercise of discretion by DCYF Child Protective investigators, including

Chief CPI Edward O'Donnell to have a second look at such serious allegation as those made against Thomas Carter by his son.

The validity of this second look was made clear by the fact that the police, the Attorney General's Criminal Division and a Grand Jury felt that there was probable cause to believe that the allegations were true. There is no evidence that Edward O'Donnell did anything other than what was required of him as Chief CPI. He is clearly entitled to qualified immunity in this action.

**Marta Brändströmskelding** - On October 5, 1999 Child Protective Investigator Marta Brändströmskelding was assigned the investigation of allegations made by Anthony (AJ) Carter against his father Thomas Carter claiming that his father had sexually molested him. These same allegations had been previously investigated by another DCYF Child Protective Investigator and had been unfounded.

The decision to reopen this investigation was made by one of the DCYF CANTS Supervisors and Chief Child Protective Investigator O'Donnell after a review of the completed investigation in light of additional information that was received after the case was unfounded.

Marta Brändströmskelding did not have anything to do with the decision to reopen the investigation. She was assigned the case after the decision had been made.

During the course of her investigation she interviewed 16 persons, including the alleged victim, the victim's mother, the father Thomas Carter, school counselors, the boy's therapist and the investigating police officer.

Her investigation is summarized in the Statement of Undisputed Facts at pages 9, 10 and 11.

Marta Brändströmskelding 's last involvement with Thomas Carter would have been on or about November 3, 1999 when she submitted her Investigative Worker's Observations/Recommendations and the supporting documentation contained in Exhibit F. She had no involvement with Joy, Caleb or Cassidy Carter.

The matter was referred to the local law enforcement authorities pursuant to R.I.G.L. § 40-11-7(f).

Thomas Carter was indicted by a Grand Jury was tried and found not guilty after trial by jury on or about March 8, 2001.

Marta Brandstromskelding was subpoenaed to testify but was never called as a witness before the Grand Jury or at trial.

There is no evidence whatsoever to show that Marta Brändströmskelding did anything other than a thorough, fair, objective and professional investigation of the allegations against Thomas Carter. She is clearly entitled to qualified immunity in this action.

The named Defendants in their individual capacities are clearly entitled to qualified immunity in this action.

VII. <u>This Action Is Barred by Res Judicata and Collateral Estoppel.</u>

Throughout all proceedings in the Rhode Island Family Court, Plaintiffs were represented by Counsel, including the children who were represented by a Guardian Ad Litem. Within hours of Caleb's removal from the home, pursuant to a physician's hold, the Rhode Island Family Court assumed jurisdiction and control of Plaintiffs' familial relationship. This jurisdiction and control continued uninterrupted from the Court's

initial order of temporary custody regarding Caleb entered on September 24, 1999, including the Court's order of temporary custody for Cassidy Carter entered on or about January 24, 2001 at least until reunification was ordered by the Family Court some time after Thomas Carter was acquitted of the child molestation charges pending against him.

All actions taken by the named DCYF defendants and the DCYF employees not named in this action who actually were involved in the removal of the children, were done with the approval of and were subject to orders of the Family Court.

Plaintiffs are bound by unappealed orders of the Family Court and are estopped from challenging them in this proceeding by the doctrine of collateral estoppel. In Re Boudakian, 137 B.R. 89 (Bankr. D.R.I. 1992); Miles Un-Ltd. Inc. v. Town of New Shoreham, 602 F.Supp. 238 (D.R.I. 1985).

VIII. Plaintiffs' Request for Injunctive Relief Should Be Denied.

Family Court proceedings, pursuant to R.I. Gen. Laws § 40-11-1, et seq. and pursuant to the Court's exclusive jurisdiction, as set forth in R.I. Gen. Laws §§ 14-1-5 and 8-10-3 are, in this type of case, in the nature of criminal proceedings.

> **a. Federal Policy Against Interference with State Court Proceedings**
>
> [7, 8] The federal courts have long recognized the "fundamental policy against federal interference with state criminal proceedings." *Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). This policy is rooted firmly in the basic federal structure of our government. Two fundamental concepts underlie our constitutional system of government; one is the precept of "separation of powers" and the other is the doctrine of federalism. The latter concept, which is most acutely at issue in this case, reflects the Founders' determination that the best governance would result if sovereignty, rather than being collected entirely within the new government, were split between the new national government and the various state

governments, as was expressed somewhat "after the fact" in the Tenth Amendment to the Constitution. *See id.* at 44, 91 S.Ct. 746.

[9] As early as 1793, Congress manifested its understanding and intention that the state courts be allowed to conduct state proceedings free from interference by the federal courts, when it prohibited the federal courts from issuing injunctions to stay proceedings in state court. See 1 Stat. 335, ch. 22, § 5 (current version at 28U.S.C. § 2283); *Younger*, 401 U.S. at 43, 91 S.Ct. 746. This congressional policy, subject to only a few exceptions, has remained essentially unaltered to this day, *see* 28 U.S.C. § 2283; *Younger*, 401 U.S. at 43, 91 S.Ct. 746, and is reflected in the federal courts' own policies, including most notably the abstention doctrine developed in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, *see, e.g., Middlesex Ethics Comm. V. Garden State Bar Ass'n*, 457 U.S. 423, 431, 102 S.Ct. 2515, 73 L.Ed. 2d 116 (1982).

As the Supreme Court has recognized, the policy against federal interference with state judicial proceedings is premised on a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.... The concept does not mean blind deference to "States' Rights" any more than it means centralization of control over every important issue in our National Government and its courts.... What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. *Younger*, 401 U.S. at 44, 91 S.Ct. 746. It is this fundamental consideration that has led the federal courts to abstain from interfering with state court proceedings even where defendants claim violations of important federal rights. *See, e.g,, Younger*, 401 U.S. at 53, 91 S.Ct. 746 (First Amendment claims); *Cruz v. Melecio*, 204 F.3d 14 (1st Cir. 2000) (freedom of speech and association, right to vote,

> and equal protection claims); *Casa Marie, Inc. v. Superior Court*, 988 F.2d 252 (1st Cir. 1993) (fair housing claim under Civil Rights Act of 1968); *Bettencourt v. Bd. of Registration in Medicine*, 904 F.2d 772 (1st Cir. 1990) (due process and equal protection claims); David v. Lansing, 851 F.2d 72, 77 (2d Cir. 1988) (*Batson* claim of race-based peremptory challenges).
>
> In Re Justices of Superior Court Dept. of Mass., 218 F.3d 11 (1st Cir. 2000); see also Gordon v. Crouchley, 554 F.Supp. 796 (D.R.I. 1982).

Plaintiffs' Count III seeking to enjoin DCYF from fulfilling its statutory obligation to protect children pursuant to R.I. Gen. Laws § 40-11-1 et seq. should be denied.

IX. Defendants in Their Individual Capacities Are Entitled to the Defenses of Qualified Immunity, Prosecutorial Immunity and Judicial Immunity With Respect to Plaintiffs' Rhode Island Constitutional Claims.

On at least two occasions the Rhode Island Supreme Court has indicated that in the appropriate case the doctrine of qualified immunity might well be applied by the State Supreme Court in relation to alleged violations of State statutes. Ensey v. Culhane, 727 A.2d 687 (R.I. 1999). Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997).

Counsel respectfully submits that the named Defendants in their individual capacities are entitled to the common law immunity defenses of judicial, prosecutorial and qualified immunity and that Plaintiffs Rhode Island constitutional claims should be denied and dismissed.

X. Sovereign Immunity Bars Plaintiffs' Rhode Island Constitutional Claims Against the State of Rhode Island and the Official Capacity Defendants.

The Rhode Island General Assembly enacted the Rhode Island Civil Rights Act – R.I. Gen. Laws §§ 42-112-1, et seq. without any express language that would waive the State of Rhode Island Sovereign Immunity. In the absence of such a waiver, the State of

Rhode Island and its named employees in their official capacities are immune from Plaintiffs Rhode Island constitutional claims in this case. Mitchell v. State Dept. of Corrections, 2003 WL 22389814 (R.I. Super. 2003); Contra, See Evans v. Dept. of Business Regulation, 2004 WL 2075132 (R.I. Super. 2004).

## CONCLUSION

Based upon the foregoing, Defendants submit that they and each of them, in both their official and individual capacities, are entitled to Summary Judgment as a matter of fact and law.

Respectfully Submitted,

Defendants Lindgren, State of
Rhode Island, Edward O'Donnell,
Martha Brändströmskelding ,
Cheryl Csisar and Maureen Eagen,
In their official and individual
capacities and Candace Salvo in her
official capacity

By their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Richard B. Woolley #1452
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2293
Fax: (401) 222-2995

**CERTIFICATION**

I, the undersigned, hereby certify that I mailed a true copy of the within document postage pre-paid, first class mail, on this 21st day of February, 2006 to those indicated below:

Carol Collins

Thomas M. Dickinson
P.O. Box 9184
Providence, RI 02940-9185