**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Thomas Carter, Joy Carter, Joy Carter As parent and next friend of Caleb O'Leary, and Thomas Carter and Joy Carter as parents and next friends of Cassidy Carter, Plaintiffs | : | |
| V. | : | C.A. NO. 04-13ML |
| Jay Lindgren, in his capacity as Director, State of Rhode Island Department of Children, Youth & Families, State of Rhode Island, and Candace Salvo, Edward O'Donnell, Martha Branstrom Skelding, Cheryl Csisar, And Maureen Eagen, in their capacities as Officers, agents or employees of the State of Rhode Island Department of Children Youth & Families, Defendants | : | |

**DEFENDANT'S REVISED AND RESUBMITTED STATEMENT OF UNDISPUTED FACTS**

1. On September 22, 1999 Lehrach, M.D. of Westerly Hospital, a duly licensed physician in the State of Rhode Island, examined Caleb O'Leary in accordance with the provisions of R.I.G.L. §§ 4-11-5 and 40-11-6 and authorized the detention of Caleb O'Leary for his protection for a period of 72 hours in the care of DCYF.

   (Affidavit of Suzanne E. Dance, Paragraph 5 – Exhibit A.)

   (Deposition of Cheryl Csisar at pages 13, 19 – Exhibit J)

2. DCYF Child Protective Investigator Suzanne E. Dance, in response to a call to the DCYF hotline from the Charlestown Police, conducted an investigation which included the following "Investigative Worker's Observations/Recommendations".

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

Department of Children, Youth and Families

Investigative Worker's Observations/Recommendations
Case Name: Joy J. O'Leary Investigation #: 217483
Worker's Name: Suzanne E. Dance Date: 11/07/1999

OBSERVATIONS/RECOMMENDATIONS:

On 9/16/99 the hotline received a report stating that there was a concern about the safety of one year old Caleb O'Leary. The report stated that there had been two 911 hang up calls on the evening of 9/15/99 and at 5 A.M. on 9/16/99 The police had responded to the first call which involved a verbal argument between Thomas Carter, his former girlfriend his current girlfriend, Caleb's mother Joy O'Leary. The two women took off in cars and one car was later discovered to have been smashed into another. When the police responded to the first call they found no one at the residence and the front sliding door shattered and the rear door left wide open. The second call involved a report that the boyfriend was threatening suicide by cutting his wrists with a knife. Mr. Carter stated that the mother had attempted to swallow a large amount of pills and he took them from her mouth. The baby was present during these incidents and was transported to the police station when the mother and boyfriend had been arrested. The mother and boyfriend had been arraigned on 9/16/99 and a no contact order had been issued to each of them. Both the mother and boyfriend tried to get the no contact order lifted and it was believed that they would be back together shortly. The mother also had charges with the Hopkington Police. The boyfriend also had had a number of charges including sexually molesting his biological children.

Thomas Carter is red flagged in DCYF records as having been convicted of domestic violence. He has an extensive criminal history which also includes convictions for Assault with a deadly weapon. Violating a No Contact Order, Harassing Phone Calls and Sexual assault.

On 9/17/99CP1 Suzanne Dance was assigned to this investigation and met with Lt. Raoul Lefebvre at the Charlestown Police station. Lt. Lefebvre reviewed several recent police reports involving Thomas Carter including a Report Dated 6/10/99 when the boyfriend made suicidal threats and later voluntarily went to Butler Hospital. Other reports involved disputes with the boyfriend's former girlfriend and allegations of sexual molestation of his daughter. Concerning the most recent incident, Lt. Lefebvre showed CPI Dance pictures of the car that the mother had admitted to smashing into another car while attempting to drive off on the morning of 9/16/99. There was a child's car seat in the car. It was unknown where the baby had been at this time.

CPI Dance went to the home but there was no one there. CPI Dance went to the home of the maternal grandmother Maureen Taylor, The grandmother had Caleb with her. She stated that the mother had told her that she would bring the baby to stay with her on 9/15/99 but had not brought him and had not contacted her. The grand mother was not aware of any problems with the current boyfriend but stated that there had been concerns about violence with the mother's past boyfriend's. The grandmother stated that the mother had told her she was going to go to work with the boyfriend.

The mother returned to the home while CPI Dance was there. The mother stated that there had been no problem the other night. When questioned by CPI Dance she stated that all of the problems were caused by her husband's ex-wife. The mother initially stated that Caleb was asleep in his room the whole time.

CPI Dance questioned the mother about where Caleb was when the police responded the first time and found no one home. The mother first stated that Caleb was home asleep, then stated she took Caleb with her and left the home and then later returned with him and put him to bed. The mother denied taking any pills stating that she had emptied a bottle of pills belonging to the boyfriend into the fireplace. She had no explanation for why she did this. When CPI Dance asked the mother why she had called the police the mother said that she had been afraid. She admitted that the boyfriend had threatened to cut himself with a knife but the mother stated that the boyfriend" is not like that anymore. He went to Butler and got help." When asked she indicated that this was in May of 1999. CPI Dance asked the mother if she was aware of any police records on the boyfriend. The mother stated that they were "only for domestic violence". The mother admitted being with the boyfriend the night before but stated that she was going to ask her mother if she could stay with her until the hearing when she stated that she would request that the restraining order be lifted. CPI Dance told the mother that if she returned to the boyfriend and there was another incident the baby would be removed. The mother agreed not to have contact with the boyfriend.

On 9/21/99 Lt. Lefebvre contacted CP1 Supervisor Candi Salvo with information about another incident that had happened at the home on 9/19/99. The police had been contacted to escort the boyfriend's ex-wife to pick up her children. The boyfriend's 11-year-old daughter, Samantha Carter had given a statement that there had been an argument between the boyfriend, the mother and a friend of the mother's. During the argument the mother attempted to remove Samantha and her sister from the home and place them with her mother. Samantha stated that she was carrying Caleb and the boyfriend grabbed her by the back of her pants to keep her from leaving and she almost fell down with Caleb. There was also a statement from the boyfriend that stated that he and the mother had taken their children to King Richard's Faire on 9/18/99 and on the way back the mother called her former boyfriend and got angry with him, left Mr. Carter's car and flagged down a passing car to go to the former boyfriend's house. The current boyfriend took the children to his house and found the mother there talking on the phone. She then left the home in his car. Mr. Carter made several calls to the mother demanding she return his car. The mother returned with a female friend between 230 and 3:00 A.M. Both were intoxicated. The boyfriend stated that he told the mother if she did not leave he would call the police. The mother pulled out the phone wires and left the home in the boyfriend's car with one of his daughters. The mother later returned without the girl and hid the car keys. Eventually she told the boyfriend that she had taken the girl to her mother's and called his ex-wife. She returned the car keys and he left with his other daughter. The mother then gave him her son to drop off at the grandmother's.
The grandmother's statement was that the mother had dropped off the boyfriend's daughter at 5:30 AM. and said she would bring the other daughter and Caleb. She did not come but later called and said that the boyfriend would be coming to pick up his

daughter. The grandmother asked about Caleb and the mother finally said the boyfriend would bring him over and that she wanted to go to Butler Hospital or someplace to get help.

CPI Dance and Supervisor Salvo discussed the case and concluded that Caleb was at risk with the mother and would need to be removed. CPI Dance contacted the Charlestown Police who responded to the home but there was no one home. CPI Dance went with Richmond Police Officers Dufficy and Arroli to the grandmother's home. The grandmother stated that she had had Caleb with her but the mother who had entered Butler Hospital the day before had asked the mother to let the boyfriend take Caleb to visit her. They had sent the mother's brother Adam O'Leary with him to ensure that Caleb was returned.

The boyfriend returned later that evening with Caleb. He stated that Joy had psychological problems and had made up the story of his attempting suicide, had put pills in her mouth to get attention and had been intoxicated on 9/19/99 and he was trying to stop her from driving with the children. He admitted being suicidal in the past but denied being suicidal at the present. He denied having any criminal convictions. The boyfriend stated that the mother had returned to his home on the evening of 9/17/99 stating that she had had the restraining order against him lifted. He denied any knowledge of a restraining order restraining the mother from being with him.

The mother's brother who resided in the maternal grandparents home had been indicated in a 1991 DCYF investigation for sexually molesting two younger siblings. There was also another investigation involving sexual abuse of the mother when she was 14 and he was 17. Other neglect was indicated because Joy stated to the investigator that Adam had put something in her mouth that was not a hot dog but would not say what it was. There was also an investigation In 1992 in which the mother's stepfather was indicated for excessive/Inappropriate Discipline against Adam.

When CPI Dance informed the grandparents that because of the past investigations she could not place Caleb in their home Adam O'Leary picked up Caleb and tried to take him out of the house. The grandparents persuaded the uncle to release the baby.

The Richmond Police returned to the home in response to CPI Dance's 911 call. The baby was removed and examined by Dr. Lehrach Westerly Hospital who filled out a PRE placing the baby on a 72 hold. Caleb was placed in a DCYF Foster home.

The mother contacted CPI Dance on 9/23. She had just returned to the boyfriend's home from Butler Hospital. The mother stated that nothing had happened on the night of 9/19/99 and that her son had not been in the home but had been on the way to her mother's home. She eventually admitted that the baby had been in the home but stated that there had been no risk to the child. She stated that she had had a temper tantrum and had gone to Butler to get help and had a referral for parenting classes.

Due to the criminal record of the mother's boyfriend, the fact that there were three domestic incidents in the mother's home within 5 days involving the boyfriend, with the baby present, and that the mother violated a restraining order and returned to her boyfriend's home with her baby despite being told by the CPI that this was unacceptable and would result in the baby being removed., there is a preponderance of evidence to support the allegations of Lack of Supervision! Caretaker against the mother and Other Neglect against Thomas Carter. The allegations are indicated.

(Affidavit of Suzanne E. Dance, Paragraph 4 – Exhibit A)

3. Thereafter on or about September 24, 1999 DCYF Legal Counsel Miguel DaCosta filed a Petition in Family Court alleging that Caleb O'Leary was neglected by reason: (1) that the parents have failed to provide said child with a minimum degree of care, supervision or guardianship, and (2) that said child is without proper parental care and supervision. In support of the Petition Suzanne Dance submitted the following affidavit.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, sc. FAMILY COURT

IN THE MATTER OF: F.C.NO.

**O'LEARY, Caleb**

AFFIDAVIT IN SUPPORT OF THE ORDER OF DETENTION, EX-PARTE

Now comes Suzanne Dance in her capacity as a Child Protective Investigator ('CPI") for the Department of Children, Youth and Families ("DCYF'D, and hereby states the following facts:

1. That on September 22, 1999, said child, Caleb O'Leary, age 1 year, was examined at Westerly Hospital, by Dr. Lehrach, a staff member of said hospital.

2. That subsequent to said examination, Dr. Lehrach filed a Physician's Report of Examination with the Department of Children, Youth and Families which is attached hereto as Exhibit A.

3. That said report indicated in part "suggest of mother dropping of child inadvertently during domestic. Mother to Butler Hospital to domestic (multiple)."

4. That on September 16, 1999, the Hotline received a report stating that there was a concern about the safety of one-year-old Caleb O'Leary.

5. That, according to the report, there had been two 911 hang up calls on the evening of September 15, 1999 and September 16, 1999 in which police responded to the first call which involved a domestic disturbance.

6. That the second call involved that the boyfriend of the mother was threatening suicide by cutting his wrists with a knife.

7. That said child was present during both incidents.

8. That the boyfriend, Thomas Carter, is known to the Department, and the record reveals that he has been convicted for domestic violence, assault with a deadly weapon, and violating a no contact order.

9. That Mr. Carter has also been charged with sexual molestation of his biological children.

10. That on September 17, 1999 CPI Suzanne Dance was assigned the investigation and spoke to mother who admitted that Mr. Carter threatened to cut himself with a knife but mother stated that he "is not like that any more, he went to Butler to get help."

11. That CPI Suzanne Dance stated to mother that if her boyfriend returned and there was another incident, the baby would be removed.

12. That on September 21, 1999 Lieutenant Lefebvre contacted the Department and relayed another incident and that occurred on September 19, 1999 in which the child was almost dropped when Mr. Carter grabbed his eleven-year-old daughter, Samantha, who was carrying Caleb at the time.

13. That Samantha and the child almost fell to the floor.

14. That said child was brought to the hospital and placed on a 72-hour hold.

15. That the following circumstances exist which would indicate that there is a substantial, immediate danger to the child which precludes the provision of preventative services as an alternative to removal: mother's placing the child at risk by allowing Mr. Carter to have access to the home. Mother's inability to protect the child.

16. That the "Summary of Facts to Substantiate Allegations of Dependency, Neglect, and/or Abuse" signed by Suzanne Dance and dated September 24, 1999, is hereby attached hereto and incorporated herein by reference as Exhibit B.

17. That the continuation of said child in the home of the parent is contrary to the welfare of the child.

18. That said child is in need of the care, protection and jurisdiction of this Honorable Court.

WHEREFORE, the Department of Children, Youth and Families prays that an Order of Detention, Ex-parte be issued.

Subscribed and sworn to as true and accurate facts on the basis of Suzanne Dance's investigation, this 24th day of September, 1999.

| | |
|---|---|
| Mary J. Simas | Suzanne Dance |
| NOTARY PUBLIC - PROVIDENCE | Child Protective Investigator |

(Affidavit of Suzanne E. Dance, Paragraph 7 – Exhibit A)

4. On September 24, 1999 an Associate Justice of the Family Court entered the following Order.

Case assigned for hearing on detention to
the 28th day of September, 1999, and
temporary custody is granted to the Department of
Children, Youth and Families and that pending said
hearing, the Court finds that the continuation of the
child in the home of the parent is contrary to the
best interest of the child; that said child requires the
protection and assistance of the State and that
reasonable efforts to prevent or eliminate the need
for removal are unnecessary due to the substantial
and immediate danger to the child.

PER ORDER:

Palombo, J. 9/24/99

______________________________

JUSTICE/ASSOCIATE JUSTICE

(Affidavit of Suzanne E. Dance, Paragraph 9 – Exhibit A)

5. After hearing on September 28, 1999 the Family Court entered an order placing Caleb O'Leary under temporary custody of DCYF.

   (Order of Temporary Custody – Exhibit B)

   (Affidavit of David M. Tassoni – Exhibit G)

6. On October 5, 1999 Child Protective Investigator Marta Brändströmskelding was assigned the investigation of allegations made by Anthony (AJ) Carter against his father Thomas Carter claiming that his father had sexually molested him. These same allegations had been previously investigated by another DCYF Child Protective Investigator and had been unfounded.

   (Affidavit of Marta Brändströmskelding – Exhibit C)

(Marta Brändströmskelding's answers to Plaintiff's Interrogatories, Answer 4 – Exhibit D)

7. The decision to reopen this investigation was made by one of the DCYF CANTS Supervisors and Chief Child Protective Investigator O'Donnell after a review of the completed investigation in light of additional information that was received after the case was unfounded.

   (Affidavit of Marta Brändströmskelding, Appendix A – Exhibit C)

8. Marta Brändströmskelding did not have anything to do with the decision to reopen the investigation. She was assigned the case after the decision had been made.

   (Affidavit of Marta Brändströmskelding, Appendix A – Exhibit C)

   (Marta Brändströmskelding's Answers to Plaintiff's Interrogatories, Answer 3 – Exhibit D)

9. During the course of Marta Brändströmskelding's investigation she interviewed 16 persons, including the alleged victim, the victim's mother, the father Thomas Carter, school counselors, the boy's therapist and the investigating police officer. Her investigation is summarized as follows:

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
Department of Children, Youth and Families

Investigative Worker's Observations/Recommendations

Case Name: Michelle Carter — Investigation #: 217848
Worker's Name: Marta Brändströmskelding — Date: 11/03/1999

OBSERVATIONS/RECOMMENDATIONS:

CPI Marta Brändströmskelding was assigned this investigation on 05 October 1999. The situation involving father (Thomas Carter) and his now 15 year old son (Anthony "AJ" Carter), had been previously investigated for allegations of "Sexual Intercourse" and

"Sexual Molestation" (in June/July of 1999) and unfounded. After one of the DCYF CANTS Supervisors, upon reviewing this completed investigation with Chief CPI O'Donnell, a determination was made to reopen the investigation. AJ Carter has related to several professionals that at the age of 5 or 6 years old he was molested by his father. AJ describes the molestation as having occurred in a previous residence in South Kingstown; his father had "made" AJ perform oral sex on him. AJ is currently residing at the Harmony Hill School as a result of a juvenile court finding that he – AJ – sexually abused a nine-year-old boy. AJ's adjudication involved his placement at Harmony, court ordered sexual abuse offenders evaluations, no contact with young children, and commitment to DCYF until FOC.

Anthony Carter told both this CPI (Brändströmskelding) and the previous CPI that he had been in the living room on the couch with his father watching TV; father was rubbing his chest and then his hand went underneath the underpants that AJ was wearing and father "started rubbing me down there". His father then unzipped his (father's) pants, brought out his penis and "made (AJ) me suck it for a few minutes". AJ told both current and past CPI that this happened only once, and that he never disclosed it to anyone and his father had "warned me not tell anyone". The revelation came out when AJ was charged with molesting a boy and he was at RITS. The previous CPI interviewed him at the RITS. The previous CPI writes in his OBS/RECS "Anthony's statement about the incident were very clear as to where the family lived, what was on television, where his mother was at the time, and the incident itself. But he could not remember where his younger sister was, how old he was, what time of day it was. Anthony's memory during the interview appeared to be quite selective about certain events, including the most recent for which he is currently in the RITS."

Anthony underwent two extensive evaluations - one as a "DAS (Diagnostic Assessment Service) from the referral date of 06/23/99 through the report date of 07/30/99 - the other was a "Sex Offender Evaluation" referred to James Moody, M.A., C.A.G.S., LMHC by Ms. Jean Mani, MSW of the RITS... evaluation was from 06/18/99 to 08/18/99. CPI Brändströmskelding must necessarily weigh the impressions and opinions at "experts" in assessing the "preponderance of the evidence" recently required under State Law. Of extreme significance to this CPI is the following narrative by James Moody: "This evaluator (James Moody) is inclined to believe the statements that have come from the (Anthony's) alleged victim. This belief is based on the fact that Anthony's alleged sexual offense against his alleged victim is a replication of the sexual abuse that he suffered at the hands of his father. What was done to him by his father, he also did to his alleged victim. There is the physical abuse of being hit by his father (which AJ did also relay to this CPI), and the sexual abuse of his father forcing his penis into his mouth when he was five (5) years old, in the same manner in which his alleged victim stated that Anthony had done to him. According to the alleged victim, Anthony hit him in the arms, legs and groin area. Anthony reported having an extensive history of being hit by his father at a very young age. Anthony himself reported that he threatened his alleged victim with bodily harm if he told anyone about the alleged sexual contact. Anthony also reported that his father threatened him not to tell anyone about the sexual contact that he was

forced into. Anthony held on to that threat until he was faced with his own alleged offense and finally revealed his abuse while in the Training School. The difference here is that his father did not have to threaten him with physical harm to keep him quiet because physical abuse was a regular routine between he and his father at that time. The threat of being physically hit for telling anyone about his sexual abuse was always implied." Another assessment by this same evaluator is also markedly significant to this CPI... .."It looks like part of his (Anthony's) sexual arousal is build around physical aggression and anger. When he starts his offending pattern, being physical with his alleged victim heightens his sexual arousal. There was no attempt to talk his alleged victim into a sexual encounter, Anthony just "took it" from him. It is the belief of this evaluator that Anthony's father did similar things to him when he was a younger child and Anthony is acting out those same situations now."

Mother, Michelle Carter, reported to the evaluators and to CPI Brändströmskelding that Anthony started displaying temper outbursts along with aggressive behaviors and other disruptive behaviors in the classroom beginning in grade five. He was subsequently referred to Harmony Hill. She had initially began counseling with Anthony when he was about three years old due to domestic violence issues between her and her now ex-husband, Tom Carter, and that counseling continued for both she and Anthony "for several more years". Michelle reports that she and Tom were married in 1986, separated in 1994 and were divorced in 1996 and cites "severe domestic violence as the precipitant to her separation and divorce."

Michelle and Tom have two other children - Samantha Carter, age 1 1 yrs 10 mos and Jessica Carter, age 7yrs 4mos. Samantha was very vocal and firm in her statements to CPI Brändströmskelding that she does not want to visit/see her father; she is afraid of him and said "Since then I've really been afraid that he's going to lose it and somebody is really going to get hurt." CPI Brändströmskelding spoke with two counselors from Samantha's school who report that Samantha has told them that she does not like to visit or stay over at her father's house and that she will get "an upset stomach and headaches when she knows she has to go." Jessica Carter told CPI that when she is with her father she gets "anxiety attacks" (appropriately describing what this feels like and explaining that "the lady doctor with the blonde hair told me that it was called that". With regards to her feelings about visiting with her father Jessica said "Well, sometimes its okay but sometimes it's real bad and he gets loud and I get scared that he's going to hit me or something."

Based on the consistent statements made by Anthony Carter to several separate professionals, the assessment of the two evaluators, father's BCI which reports a "nolo" plea to "Second degree sexual assault" on two 13 year old girls, and this CPI's experience of twenty plus years of working with sexual abuse victims, there exists a preponderance of evidence to substantiate the allegations of "Sexual Molestation" and "Sexual Intercourse" and both are therefore INDICATED against Thomas Carter.

(Affidavit of Marta Brändströmskelding, Appendix A – Exhibit C)

(Marta Brändströmskelding's Answers to Plaintiff's Interrogatories – Exhibit D)

10. On May 9, 2000 Thomas Carter was indicted for Count I First Degree Child Molestation, Count II Second Degree Child Molestation

    (Criminal Docket Sheet Report W1–2000–0187A – Exhibit E)

11. A sexual abuser poses a risk to his or her children in the home even in absence of actual evidence of abuse to the children.

    (See In re Ashley D., 621 A.2d 1258 (R.I.,1993); In re Jessica C., 690 A.2d 1357 (R.I.,1997))

12. On January 23, 2001 Child Protective Investigator Paul Ventura went to the Carter Home and placed Cassidy Carter on a 48 hour hold pursuant to R.I. Gen. Laws § 40-11-5(d).

    (Affidavit of Suzanne Zuffoletti, Paragraph 5 – Exhibit F)

13. On January 24, 2001 Suzanne Zuffoletti, in her capacity as a Social Case Worker for DCYF filed a Petition and "Affidavit In Support of the Order of Detention – Ex Parte," with the Family Court regarding Cassidy Carter.

The Affidavit states as follows:

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC. FAMILY COURT
IN THE MATTER OF: F.C. NO.
**CARTER, Cassidy**

**AFFIDAVIT IN SUPPORT OF THE ORDER OF DETENTION, EX-PARTE**

Now comes Suzanne Zuffoletti in her capacity as a Social Caseworker ("SCW II") for the Department of Children, Youth and Families ("DCYF"), and hereby states the following facts:

1. That said child was born on January 20, 2001 to Thomas and Joy Carter.
2. That both Mr. and Mrs. Carter are indicated sexual perpetrators of children.

3. That father has three (3) other children who are in the Department of Children, Youth and Families care and father is scheduled to stand trial in February, 2001 for sexual molestation charges as to his son.
4. That mother has one (1) other child who is in the Department of Children, Youth and Families foster care since September, 1999.
5. That mother has disclosed that she sexually molested her younger half brother and is unwilling to undergo a sex offender evaluation.
6. That the Department was not alerted by the hospital that mother gave birth to Cassidy.
7. That on January 23, 2001 when the Department was informed that mother gave birth to another child, CPI Paul Ventura went to the Carter home and placed the child on a 48 hour hold.
8. That mother also has a history of substance abuse depression and domestic violence.
9. That father's criminal history includes domestic assault, disorderly conduct, violation of restraining order and sexual molestation.
10. That the following circumstances exist which would indicate that there is a substantial, immediate danger to the child which precludes the provision of preventative services as an alternative to removal; mother and father's history of sexual abuse of children, domestic violence issues and substance abuse issues.
11. That the "Summary of Facts to Substantiate Allegations of Dependency, Neglect, and/or Abuse" signed by Suzanne Zuffoletti and dated 24th of January 2001 is hereby attached hereto and incorporated herein by reference as Exhibit A.
12. That the continuation of said child in the home of the parent is contrary to the welfare of the child.
13. That said child is in need of the care, protection and jurisdiction of this Honorable Court.

WHEREFORE, the Department of Children, Youth and Families prays that an Order of Detention, Ex-parte be issued.

Subscribed and sworn to as true and accurate facts on the basis of Suzanne Zuffoletti's investigation, this ____ day of January, 2001.

______________________________ ______________________________

NOTARY PUBLIC – PROVIDENCE Social Caseworker II

(Affidavit of Suzanne Zuffoletti, Paragraph 5 – Exhibit F)

14. Thereafter, on January 24, 2001 the Family Court entered the following Order:

> Case assigned for hearing on detention to the 30th day of January, 2001, and temporary custody is granted to the Department of Children, Youth and Families and that

pending said hearing, the Court finds that the continuation of the child in the home of the parent is contrary to the best interest of the child, that said child requires the protection and assistance of the State and that reasonable efforts to prevent or eliminate the need for removal are unnecessary due to the substantial and immediate danger to the child.

PER ORDER:

__________________________________
JUSTICE/ASSOCIATE JUSTICE

(Affidavit of Suzanne Zuffoletti – Exhibit F)

15. From the time the Family Court first granted temporary custody of Caleb to DCYF on September 24, 1999 through the date when Caleb and his half sister Cassidy were reunified with Joy O'Leary Carter and Thomas Carter by the Court, Joy and Thomas were represented by legal counsel in all Family Court proceedings and Caleb O'Leary and Cassidy Carter were represented by a Guardian Ad Litem.

    (Affidavit of David M. Tassoni – Exhibit G)

16. Maureen Egan had no involvement in the action to remove Cassidy Carter from the home of Plaintiffs Thomas Carter and Joy Carter on or about January 23, 2001.

    (Maureen Egan Answers to Plaintiff's Interrogatories, Answer 3 – Exhibit H)

17. Maureen Egan had no involvement with Plaintiffs Thomas Carter, Joy Carter, Caleb O'Leary, and Cassidy Carter on or after December 17, 2000.

    (Maureen Egan Answers to Plaintiff's Interrogatories, Answer 3 – Exhibit H)

    (Deposition of Maureen Egan at page 54 – Exhibit I)

18. Removal from Custody of and Reunification of Caleb and Cassidy with Tom and Joy Carter was at all times subject to Family Court approval.

(Deposition of Maureen Egan at pages 53 and 54 – Exhibit I)

(Deposition of Cheryl Csisar at page 19 – Exhibit J)

(Deposition of Cheryl Csisar at pages 26 and 27 – Exhibit J)

(Deposition of Cheryl Csisar at pages 60, 72, 73 – Exhibit J)

19. Cheryl Csisar had no involvement in the removal of Cassidy Carter from the home of Plaintiffs Thomas Carter and Joy Carter on or about January 23, 2001.

(Cheryl Csisar's Answers to Interrogatories, Answer 3 – Exhibit K)

(Deposition of Cheryl Csisar at page 62 – Exhibit J)

20. Cheryl Csisar had no involvement in the removal of Caleb O'Leary from the home of Joy O'Leary Carter on or about September 22, 1999.

(Cheryl Csisar's Answers to Interrogatories, Answer 4 – Exhibit K)

(Deposition of Cheryl Csisar at page 18 – Exhibit J)

(Deposition of Cheryl Csisar at page 62, 71 and 72 – Exhibit J)

21. The Family Court issued a No Contact Order regarding Thomas Carter with Caleb O'Leary.

(Deposition of Cheryl Csisar at page 25 – Exhibit J)

(Deposition of Cheryl Csisar at pages 34, 35 and 36 – Exhibit J)

22. Cheryl Csisar was never involved in the investigation/indication of Thomas Carter for sexual molestation of his son.

(Deposition of Cheryl Csisar at pages 48, 49 and 50 – Exhibit J)

23. Cheryl Csisar's last involvement with any of the named plaintiffs or their DCYF cases was December 2000.

(Deposition of Cheryl Csisar at pages 60, 61, 73 and 74 – Exhibit J)

**STATEMENT OF UNDISPUTED FACTS – EXHIBITS**

A. Affidavit of Suzanne E. Dance

B. Order of Temporary Custody

C. Affidavit of Marta Brändströmskelding

D. Marta Brändströmskelding's answers to Plaintiff's Interrogatories

E. Criminal Docket Sheet Report W1–2000–0187A

F. Affidavit of Suzanne Zuffoletti

G. Affidavit of David M. Tassoni

Various Family Court Stipulations and Orders – Caleb O'Leary and Cassidy Carter.

(1) Decree dated 11-16-99
(2) Stipulation/Order dated 11-30-99
(3) Court Docket dated 12-7-99
(4) Decree dated 2-3-00
(5) Motion dated 6-15-00; Heard 7-11-00
(6) Stipulation/Order dated 7-11-00
(7) Stipulation/Order dated 11-14-00
(8) Motion dated 12-22-00; Heard 1-9-01
(9) Stipulation/Order dated 1-9-01
(10) Stipulation/Order dated 2-20-01
(11) Stipulation/Order dated 2-27-01
(12) Motion to Vacate Temporary Restraining Order dated 3-15-01; Heard 3-27-01
(13) Motion for Placement dated 3-15-01; Heard 3-27-01
(14) Stipulation/Order dated 3-27-01
(15) Motion for Emergency Review dated 5-18-01; Heard 5-22-01
(16) Motion for Placement dated 6-6-01; Heard 6-26-01
(17) Motion to Vacate Temporary Restraining Order dated 6-6-01; Heard 6-26-01
(18) Stipulation/Order dated 6-26-01
(19) Stipulation/Order dated 7-31-01
(20) Decision of Magistrate George N. DiMuro dated 6-7-01
(21) Guardian's Report In the Matter of Cassidy Carter dated May 29, 2001
(22) Stipulation/Order dated 11-27-01

H. Maureen Egan Answers to Plaintiff's Interrogatories

I. Deposition of Maureen Egan

J. Deposition of Cheryl Csisar

K. Cheryl Csisar's Answers to Interrogatories

Defendants Lindgren, State of Rhode Island, Edward O'Donnell, Martha Brändströmskelding , Cheryl Csisar and Maureen Egan, In their official and individual capacities and Candace Salvo in her official capacity

By their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Richard B. Woolley

Richard B. Woolley #1452
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2293
Fax: (401) 222-2995

**CERTIFICATION**

I, the undersigned, hereby certify that I mailed a true copy of the within document postage pre-paid, first class mail, on this 21st day of July, 2006 to those indicated below:

Carol Collins

Thomas M. Dickinson
P.O. Box 9184
Providence, RI 02940-9185