UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS CARTER, JOY CARTER,
JOY CARTER as Parent and Next Friend of
CALEB O'LEARY, and THOMAS CARTER
and JOY CARTER as Parents and Next Friends of
CASSIDY CARTER,
Plaintiffs,

v. CA 04-013 ML

JAY LINDGREN, in his individual capacity and
in his capacity as Director, State of Rhode Island
Department of Children, Youth and Families, STATE
OF RHODE ISLAND, and CANDACE SALVO,
EDWARD O'DONNELL, MARTA BRANSTROM SKELDING,
CHERYL CSISAR, and MAUREEN EAGEN, in their individual
capacities and in their capacities as officers, agents,
or employees of the State of Rhode Island Department of
Children, Youth and Families,
Defendants.

## MEMORANDUM AND ORDER

This case is before the Court on Defendants' Motion for Summary Judgment. For the reasons set forth below, the Motion for Summary Judgment is granted.

### I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the

case. Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Nor may the court accept the nonmovant's subjective characterizations of events, unless the underlying events themselves are revealed." Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 50 (1st Cir. 1999) (citation omitted). The court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997) (citation omitted).

D.R.I. LR Cv 56(a)(1) provides that "[i]n addition to the memorandum of law required by LR Cv 7, a motion for summary judgment shall be accompanied by a Statement of Undisputed Facts that concisely sets forth all facts that the movant contends are undisputed and entitle the movant to judgment as a matter of law." D.R.I. LR Cv 56(a)(1). The Court assumes these facts are admitted to exist "unless expressly denied or otherwise controverted by a party objecting to the motion." D.R.I. LR Cv 56(a)(3). In addition to a memorandum of law and a Statement of Undisputed and Disputed Facts, as provided for by D.R.I. LR Cv 7 and 56(a)(4), Plaintiffs submitted the affidavit of Thomas Carter ("Carter") to the Court, in opposition to Defendants' Motion for Summary Judgment. Carter's affidavit, however, fails to meet the requirements of

Fed. R. Civ. P. 56(e), specifically, that "affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence . . . ." Fed. R. Civ. P. 56(e); see also Peng-Fei Chang v. Univ. of Rhode Island, 554 F.Supp. 1203, 1206 (D.R.I. 1983) (noting that the "affidavit adds nothing to the defendants' motion because, to the extent it is not conclusory, it is in material part bottomed on facts not within his personal knowledge . . ."). As such, Carter's affidavit will not be considered by the Court in evaluating Defendants' Motion for Summary Judgment.

## II. Background

On September 16, 1999, the Department of Children, Youth and Families ("DCYF") received a report from the Charlestown Police Department concerning the safety of then one-year old Caleb O'Leary ("Caleb"). According to the report, police officers had responded to two 911 calls, one on the evening of September 15, 1999, and the other on the morning of September 16, 1999, at the residence of Carter and his girlfriend Joy O'Leary ("Joy"), Caleb's mother. When the police first arrived they found no one at the residence. Officers observed that the front sliding door was shattered and the rear door was "wide open." Upon arriving at the Carter residence following the second 911 call, officers were told by Carter and his girlfriend that Carter had threatened suicide and that Joy had attempted to swallow a large amount of pills. Carter and Joy were subsequently arrested and transported to the Charlestown Police Station. Joy later gave DCYF investigators conflicting statements about where Caleb was when police responded to the first 911 call. Caleb was in the home when police responded to the second 911 call, and was taken to the police station along with Carter and Joy. Although the record is unclear, the Court

assumes that Caleb was returned to Carter and Joy shortly thereafter.

On September 17, 1999, a DCYF agent was assigned to investigate the incidents at the Carter residence and to make a determination regarding Caleb's safety. The DCYF investigator interviewed Carter, Joy, and members of Joy's family, as well as officers from the Charlestown Police Department. The investigator also learned from DCYF records that Carter had a criminal history, including convictions for domestic violence, assault with a deadly weapon, and violating a no contact order.

On September 21, 1999, DCYF was contacted by the Charlestown Police Department concerning an incident involving Caleb. Allegedly, Caleb was almost dropped two days earlier during an argument between Carter and his ex-wife. At the time, Joy was at Butler Hospital to, in her own words, "get help." Caleb was staying with Joy's parents while she was in the hospital. Carter had taken Caleb from Joy's parents for the purpose of visiting Joy at the hospital. Based on the above investigation, DCYF determined that Caleb should be removed from the custody of Joy.

On September 22, 1999, a DCYF investigator and police officers removed Caleb from the home of Joy's parents and brought him to Westerly Hospital. Caleb was examined by a physician and placed on a seventy-two hour hold pursuant to R.I. Gen. Laws § 40-11-5(a), thus allowing DCYF time to petition the Family Court for temporary custody. On September 24, 1999, a judge of the Family Court entered an order granting DCYF custody of Caleb until a hearing could be held on September 28, 1999. Following the hearing, DCYF was granted temporary custody of Caleb.

On October 5, 1999, another DCYF agent was assigned to investigate allegations that Carter had sexually molested his son from a previous marriage. These allegations had previously been investigated by DCYF and were found to have no merit. The case was reopened after Carter's then fifteen-year old son was found by a juvenile court to have sexually abused a nine-year old boy. After a month-long investigation of the allegations against Carter, including interviews with Carter's son, his parents, school counselors, therapist, and the investigating police officer, the DCYF investigator concluded that there was enough evidence to support the allegations of molestation. A criminal investigation ensued and, on May 9, 2000, Carter was indicted for First and Second Degree Child Molestation. He was scheduled to stand trial in February 2001.

On January 17, 2001, Joy gave birth to Cassidy. Carter is Cassidy's father. On January 23, 2001, DCYF learned for the first time that Joy had given birth to Cassidy and that she and Cassidy were residing with Carter. Based in large part on the pending sexual molestation charges against Carter, DCYF determined that Cassidy should be removed from the home. On January 23, 2001, a DCYF agent, accompanied by police officers, removed Cassidy from the Carter residence and placed her on a forty-eight hour hold pursuant to R.I. Gen. Laws § 40-11-5(d). The DCYF agent stated that Cassidy was healthy at the time she was taken into custody and there was no evidence of neglect or abuse at that time. On January 24, 2001, DCYF was granted temporary custody of Cassidy by a judge of the Family Court.

On March 8, 2001, Carter was found not guilty of the charges of sexual molestation. Caleb and Cassidy were returned to Carter and Joy in August of 2001. On January 15, 2004,

Carter, both as to himself and as parent and next friend of Cassidy, and Joy, as to herself and as parent and next friend of Caleb and Cassidy (the "Plaintiffs"), filed the instant action.[1]

III. Discussion

An amended complaint, filed on April 5, 2005, asserts in Counts I and II that Defendants have deprived Plaintiffs of their rights, privileges, and immunities secured by the United States and Rhode Island Constitutions. Specifically, Plaintiffs argue under Count I that the Defendants are liable pursuant to 42 U.S.C. § 1983 for infringing on their constitutional right to familial integrity. Plaintiffs also seek injunctive relief, asking the Court in Count III to restrain Defendants from further depriving Plaintiffs of the rights guaranteed by the United States and Rhode Island Constitutions.[2] Defendants argue that the doctrine of qualified immunity shields the performance of their official duties from personal liability. The Court analyzes each of Plaintiffs' claims in turn.

A. Count I - the § 1983 claim

Section 1983 protects the public from government officials who abuse their authority by violating the constitutional rights of others. Hatch v. Dep't for Children, Youth and their

---

[1] In a hearing on Defendants' Motion for Summary Judgment on September 11, 2006, Plaintiffs conceded that Defendants Jay Lindgren ("Lindgren") and Candace Salvo ("Salvo") should be dismissed from the present action. Accordingly, the Court dismisses the Plaintiffs's claims as to Lindgren and Salvo.

[2] Although not clear from the complaint, nor was it briefed, Plaintiffs also raised a claim at oral argument concerning Defendant Cheryl Csisar ("Csisar") and her alleged interference with Carter and Joy's relationship. Plaintiffs contend that this is interference with the integrity of the family. Plaintiffs conceded, however, that Csisar's last involvement with the family was December 8, 2000, and as such, the claim is barred by the statute of limitations.

Families, 274 F.3d 12, 19 (1st Cir. 2001) (noting that "[p]ersons acting under color of state law are liable under 42 U.S.C. § 1983 for infringing on the constitutional rights of private parties."). Section 1983 subjects officials who commit such abuses to personal liability in a civil suit for damages. Anderson v. Creighton, 483 U.S. 635, 638 (1987) ("[w]hen government officials abuse their offices, 'action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.'" (quoting Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982)).[3] This liability is not without limits; courts have consistently provided "government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson, 483 U.S. at 638 (citations omitted). The doctrine of qualified immunity protects government officials from "the chilling threat of liability" for the difficult decisions they must make in the discharge of their duty. Swain v. Spinney, 117 F.3d 1, 10 (1st Cir. 1997).

The First Circuit has articulated a three-step analysis for "determining whether qualified immunity is available to a particular defendant at a particular time." Hatch, 274 F.3d at 20. "We ask, first, whether the plaintiff has alleged the violation of a constitutional right. If so, we then ask whether the contours of the right were sufficiently established at the time of the alleged violation. Finally, we ask whether an objectively reasonable official would have believed that

[3] Plaintiffs bring this claim against Defendants in their individual and official capacities. Plaintiffs acknowledge, however, that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). As such, the Court will not consider Plaintiffs' claim against Defendants in their official capacity.

the action taken or omitted violated that right." Id. (citation omitted). As the First Circuit has suggested, the Court makes these three inquiries in sequence, "mindful that a single negative answer suffices to defeat the plaintiff's claim for damages." Id. (citation omitted).

Initially, the Court looks to see if a plaintiff has alleged the violation of a constitutional right. Id. Here, Plaintiffs contend that Defendants have violated their constitutional right to familial integrity, or more specifically, the interest of the Plaintiffs in the care, custody, and control of their children. "The interest of parents in the care, custody, and control of their children is among the most venerable of the liberty interests embedded in the Constitution." Id. (citing Troxel v. Granville, 530 U.S. 57, 65 (2000)). This right, however, is not absolute or unqualified, and "does not include the right to be free from child abuse investigations." Strail v. Dep't of Children, Youth, and Families, 62 F.Supp.2d 519, 528 (D.R.I. 1999) (citing Watterson v. Page, 987 F.2d 1, 8-9 (1st Cir. 1993)). The state has a valid interest in "the best interests of the child and the interest of society in the maturation of children as future citizens." Hatch, 274 F.3d at 20 (citing Frazier v. Bailey, 957 F.2d 920, 929-30 (1st Cir. 1992)).

Balancing the competing interests of parents and the state, the First Circuit has held that "the Constitution allows a case worker to take temporary custody of a child, without a hearing, when the case worker has a reasonable suspicion that child abuse has occurred (or, alternatively, that a threat of abuse is imminent)." Id. at 22. Absent a sufficient investigation and credible information supporting a reasonable suspicion, a parent's right to the care, custody, and control of a minor child is inviolate. See Strail, 62 F.Supp.2d at 530. In this instance, Plaintiffs have sufficiently identified a constitutional right.

The second step of the inquiry focuses on whether the contours of the constitutional right that Plaintiffs have identified, namely, a parent's right to custody in the absence of a case worker's reasonable suspicion of child abuse, was clearly established at the time of the critical events. Hatch, 274 F.3d at 22. Plaintiffs argue that the right involved here was sufficiently defined at the time of DCYF's actions in the removal of Cassidy on January 23, 2001, to overcome the second hurdle in the qualified immunity analysis. Plaintiffs are silent as to DCYF's actions in regard to the removal of Caleb on September 22, 1999.

"The critical inquiry here is whether the dimensions of the right were sufficiently well-defined that a reasonable official would have understood that his actions violated that right." Id. (citing Anderson, 483 U.S. at 640.). The First Circuit has concluded that, at the least, "in the spring of 2000, an objectively reasonable case worker surely would have believed that taking temporary custody of a child prior to a hearing would violate the parents' interest in the child's care, custody, and control if he acted without a reasonable suspicion of child abuse (actual or imminent)." Id. at 22-24 (surveying the "widespread agreement that has developed as to the applicable legal regime"). Given the foregoing, the Court believes that the right of a parent to the care, custody, and control of his children, absent a reasonable suspicion of child abuse, was sufficiently defined at the time of Caleb and Cassidy's removal to warrant making the third inquiry of the qualified immunity analysis.

Finally, the Court considers whether an objectively reasonable official would have believed that the action taken violated a plaintiff's constitutional right. Id. at 20. The specific question here is whether DCYF employees had reliable information, sufficient to support a

reasonable suspicion of abuse or potential for imminent harm, when they removed Caleb and Cassidy from their parents' custody. Before addressing this question, it is useful to understand the degree of protection the qualified immunity doctrine offers government officials during the performance of their official duties. The First Circuit has stated that "the defense of qualified immunity offers sanctuary not only to government officials who act with impeccable propriety, but also to those who err but could not reasonably have understood that their actions infracted a prospective plaintiff's federally assured rights." Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1992) (citations omitted). Put more simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Significantly, the First Circuit has recognized the "enormous pressure" that faces DCYF workers when "confronted with the necessity of making on-the-spot judgments on the basis of limited and often conflicting information." Hatch, 274 F.3d at 22. Furthermore, DCYF investigators are regularly confronted with circumstances that force them to "make difficult choices without time for extensive investigation." Id. "When presented with evidence of apparent child abuse, a case worker must have a fair amount of leeway to act in the interest of an imperilled child - and it is better to err on the side of caution than to do nothing and await incontrovertible proof." Id.

Against this formidable backdrop, Plaintiffs argue that DCYF investigators did not have a reasonable suspicion of child abuse (actual or imminent) to have removed either Caleb or Cassidy. As to Cassidy, Plaintiffs point primarily to Carter's subsequent acquittal of the sexual

molestation charges brought against him and a statement by a DCYF investigator that Cassidy was healthy and showed no signs of abuse at the time of her removal from Carter's home. Plaintiffs also argue that the decision to remove Cassidy was based solely on DCYF's earlier decision to remove Caleb.

Addressing the removal of Caleb first, the record shows that DCYF investigators had a reasonable basis for their conclusion that Caleb was in immediate danger if he stayed in Carter's home. DCYF agents were contacted by Charlestown police after a series of incidents occurred at Carter's home, while Caleb was present, and culminating in Carter and Joy's arrest in the early morning hours of September 16, 1999. DCYF investigators were again contacted by the Charlestown Police Department following a report that Caleb had almost been dropped during an argument between Carter and his ex-wife. More importantly, DCYF sought temporary custody of Caleb subsequent to a seventy-two hour hold initiated by a physician at Westerly Hospital, pursuant to R.I. Gen. Laws § 40-11-5(a). The Court therefore finds that DCYF removed Caleb from the custody of his mother based on a sufficient investigation and with reasonable suspicion that Caleb was in imminent danger.

The record evidence provides an even stronger basis for qualified immunity with respect to the removal of Cassidy from Carter's home. Carter was scheduled to go to trial on two charges of sexual molestation involving his son from a previous marriage in February 2001. Cassidy was removed from Carter's home on January 23, 2001, when DCYF first learned of her birth. According to the record, DCYF based its decision in large part on the indictment of Carter for sexual molestation. See In re Lester, 417 A.2d 877, 881 (R.I. 1980) ("The state's role in

protecting children may properly be preventive of harm as well as remedial.") (citations omitted). That Carter was ultimately acquitted of those charges is irrelevant. What is relevant is the reliable information and resultant suspicions DCYF investigators had at the time they took Cassidy into custody. As stated earlier, the doctrine of qualified immunity does not protect only those government officials "who act with impeccable propriety, but also [] those who err . . ." Quintero, 974 F.2d at 228; see also Malley, 475 U.S. at 341 (emphasizing that the qualified immunity standard protects many mistaken judgments). The Court finds that DCYF investigators acted on a reasonable suspicion that Cassidy was in imminent danger.

B. Count II - state law claims

Plaintiffs allege that Defendants have deprived them of the rights, privileges, and immunities secured by the Rhode Island Constitution.[4] Defendants again raise the defense of qualified immunity. In Ensey v. Culhane, the Supreme Court of Rhode Island stated that "in an appropriate case, the doctrine of qualified immunity might well be applied by this Court." 727 A.2d 687, 690-91 (R.I. 1999) (citing Harlow, 457 U.S. at 818); see also Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997). Significantly, the First Circuit has described Ensey and

[4] Plaintiffs bring this claim against Defendants in their individual and official capacities. Plaintiffs' state law claim against the State of Rhode Island and individual employees of DCYF, acting in their official capacities, is barred by the Eleventh Amendment. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) (establishing that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.") (internal quotation marks and citations omitted); Quern v. Jordan, 440 U.S. 332, 337 (1979) ("[A] suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.") (internal citations omitted). Since the State of Rhode Island has not consented to this suit, this portion of Plaintiffs action is barred by the Eleventh Amendment.

Pontbriand as "reflect[ing] Rhode Island's recognition of a qualified immunity defense under state law analogous to the federal doctrine established by the United States Supreme Court in Harlow v. Fitzgerald . . . ." Hatch v. Town of Middletown, 311 F.3d 83, 90 (1st Cir. 2002). This Court finds this to be "an appropriate case" to apply the doctrine of qualified immunity. Ensey, 727 A.2d at 690. For the same reasons this Court articulated in Part A, Plaintiffs' state constitutional claims fail as a matter of law.

C. Count III - injunctive relief

Plaintiffs also seek injunctive relief, asking the Court to restrain Defendants from further depriving them of the rights guaranteed by the United States and Rhode Island Constitutions. Given Plaintiffs' failure to prevail on any of their substantive claims, the Court denies Plaintiffs' request for injunctive relief.

IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.

SO ORDERED.

Mary M. Lisi
United States District Judge
September 29, 2006